Sandra **SHEIKH**, Petitioner,

v.

**DEPARTMENT OF PUBLIC SAFETY, State of Utah, and Industrial Commission of Utah, Respondents.**

No. 940563–CA.

Court of Appeals of Utah.

Oct. 12, 1995.

Suzanne West, McDonald & West, Salt Lake City, for Petitioner.

Stephen G. Schwendiman, Assistant Attorney General, Jan Graham, State Attorney General, Salt Lake City, for Respondent Dept. of Public Safety, State of Utah.

Before DAVIS, Associate P.J., and BILLINGS and WILKINS, JJ.

DAVIS, Associate Presiding Judge:

Petitioner Sandra Sheikh petitions for review of the Industrial Commission's (Commission) order denying her motion for review and affirming the administrative law judge's (ALJ) decision that she did not establish a prima facie case of employment discrimination under Utah Code Ann. § 34–35–6 (1994). We affirm.

## FACTS

Sheikh was employed as a dispatcher with the Carbon County Sheriff's Department for over ten years prior to her resignation on May 10, 1990. In August 1988, the Sheriff's Department dispatch function was consolidated with that of the Utah Highway Patrol and thereby became part of the Utah Department of Public Safety.

The dispatch office was understaffed and had little flexibility in scheduling work shifts.[1] Limited personnel and unexpected circumstances often required an employee to work an undesirable shift called a "double-back" or "short change" which refers to working a shift and then returning to work another shift within less than eight or nine hours. Temporary employees were used if permanent employees could not fill the necessary shifts; however, because of budgetary constraints, their use was limited.

In the fall of 1989, Sheikh learned she was pregnant and informed the shift manager, Lisa Shook. On January 7, 1990, Sheikh gave notice to the dispatch manager, Nancy

---

1. This fact was reflected in the "Radio Dispatcher Supplemental Information" form which provided that dispatchers:

 —[would b]e required to work any of three shifts or cover shifts (i.e., day, swing, graveyard or any variation).
 —[would b]e required to work weekends on a regular basis.
 —[would b]e unable to choose [their] days off or [their] shifts.
 —[m]ay have to work split days off during a work week (i.e., days off may be Tuesday and Friday).
 —[m]ay have to work any or all holidays.
 —[may h]ave to procure own child care at one hour's notice for any time of day or night.
 —[may h]ave to get own child care for weekends, holidays and middle of night on a regular basis.
 —[may h]ave to arrange for reliable transportation to work on a regular basis.
 —[must b]e prepared to work immediately when [their] shift begins....
 —[m]ay have to cancel days off or holiday plans on short notice.

 On October 26, 1989, Sheikh acknowledged by signature that she had "read and considered" all of the above enumerated factors.

Allred, that she expected to take maternity leave commencing February 14, 1990. Because Sheikh's due date subsequently changed, she gave written notice to Allred stating she did not desire to take maternity leave until March 8, 1990 and the schedule was changed accordingly.[2]

Prior to February 22, 1990, the dispatch employees worked a two week rotational schedule which was adjusted for unexpected events such as employee sickness or emergencies. However, because the two week rotational schedule gave little time for employees to adjust to the new schedule and often created double-back shifts when the schedule rotated, a three week rotational schedule was implemented on March 3, 1990. In February 1990, a letter was distributed to all employees describing this scheduling change.

While Sheikh was on maternity leave, Patti, a fellow dispatch employee, quit and Russele was hired to replace her.[3] According to procedure, Russele was assigned to take over Patti's schedule. However, because Patti had been scheduled to work several graveyard shifts, and it was department policy that a new employee could not work a graveyard shift, it became necessary to adjust the schedule.

Shortly before Sheikh returned from maternity leave, she received a call from Shook who explained that adjustments had been made to Sheikh's returning schedule. Because Sheikh was scheduled to work afternoons upon her return, she was switched to cover the graveyard shifts that Russele could not work. This change corresponded with long-standing dispatch center policy providing that when a person was unable to work a graveyard shift, the dispatcher scheduled for the afternoon shift would switch and work the graveyard shift.[4] Although Sheikh inquired about the double-back this change created, she did not tell Shook that this would create any intolerable problems and she declined Shook's offer to allow her to work three graveyard shifts instead of having to work the double-back. In addition, Sheikh did not attempt to modify her schedule by asking fellow employees to trade shifts.

On May 10, 1990, shortly after Sheikh returned to work, she submitted a letter of resignation. Sheikh listed an inability to obtain a babysitter as her reason for terminating her employment with the dispatch center. However, on August 14, 1990, Sheikh filed a claim with the Commission claiming she was constructively discharged because of discrimination based upon pregnancy and pregnancy-related matters in violation of Utah Code Ann. § 34–35–6 (1994).

After a formal hearing, the ALJ issued an order dismissing, with prejudice, Sheikh's charge of unlawful employment discrimination against the Department of Public Safety, concluding that she failed to establish a prima facie case of employment discrimination. Sheikh then filed a motion for review before the Commission. On August 25, 1994, the Commission issued an order denying her motion for review and sustaining the ALJ's decision. Sheikh appeals.

## STANDARD OF REVIEW

 This court will grant a party relief from an agency's decision if the party "has been substantially prejudiced" by the agency's erroneous interpretation or application of the law. Utah Code Ann. § 63–46b–16(4)(d) (1993). Whether a party has failed to establish a prima facie case is a question of law. *Handy v. Union Pac. R.R.*, 841 P.2d 1210, 1215 (Utah App.1992). When reviewing an agency's conclusion regarding a question of law, we accord the agency decision no deference, but review it for correctness. *Savage Indus. v. State Tax Comm'n*, 811 P.2d 664, 668 (Utah 1991); *Hilton Hotel v. Industrial Comm'n*, 897 P.2d 352, 354 (Utah App.1995).

**2.** Although Shook was in charge of making the schedule, Allred had the final authority.

**3.** Patti's and Russele's surnames do not appear in the record.

**4.** Sheikh testified that she was aware of this policy.

## ANALYSIS

■ Sheikh's claim is brought pursuant to Utah Code Ann. § 34–35–6(1)(a)(i) (1994), which states, in pertinent part, that it is a "prohibited employment practice ... for an employer to ... retaliate against, harass, or discriminate in matters of compensation or in terms, privileges, and conditions of employment against any person otherwise qualified, because of ... *pregnancy*, childbirth, or *pregnancy-related conditions.*" *Id.* (emphasis added).

Sheikh states she was given a difficult schedule containing several double-backs because Allred was upset that Sheikh told Shook of her pregnancy first and because changing the date of her maternity leave required modification of the schedule. Sheikh argues that temporary employees were used prior to her return to prevent giving anyone else such a difficult schedule and that no one had, in the two years prior to her resignation or thereafter, been given such a difficult schedule.

The state claims that Sheikh was given the difficult schedule in accordance with longstanding department policy requiring the employee on the afternoon shift to switch with the employee on the graveyard shift when there was a conflict. In addition, the dispatch center did not consider using temporary employees after Sheikh's return because she did not complain about the schedule until she quit. No one else had been given a similar schedule because the dispatch office had recently changed from a two week to a three week rotational schedule. Finally, Shook, not Allred, modified the schedule following longstanding department policy.

■ To establish a claim of employment discrimination, the "employee has the initial burden to establish a prima facie showing of the employer's discrimination." *Bowen v. Valley Camp of Utah, Inc.*, 639 F.Supp. 1199, 1201–02 (D.Utah 1986); *accord McDonnell*

Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Once a prima facie case has been established, the burden to produce evidence shifts to the employer who must articulate a legitimate, nondiscriminatory reason for its suspect conduct. *University of Utah v. Industrial Comm'n*, 736 P.2d 630, 634 (Utah 1987); *accord McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Bowen*, 639 F.Supp. at 1202. If the employer succeeds in rebutting the inference of discrimination, the burden of production shifts back to the employee who must then show by a preponderance of the evidence that the employer's articulated reasons were merely a pretext for discrimination. *University of Utah*, 736 P.2d at 635; *accord McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825; *Bowen*, 639 F.Supp. at 1202. The ultimate burden of persuasion that the employer discriminated against the employee " 'remains at all times with the plaintiff.' " *University of Utah*, 736 P.2d at 635 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).

■ In order to establish a prima facie case of pregnancy discrimination, a plaintiff must show that she (1) was a member of a protected class, (2) was qualified for and was performing the job, and (3) was terminated because of her pregnant condition. *University of Utah*, 736 P.2d at 634; *accord McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Bowen*, 639 F.Supp. at 1202.[5] Either circumstantial or direct evidence may be used to prove that "the employer was motivated by an improper and discriminatory purpose in his [or her] conduct." *Bowen*, 639 F.Supp. at 1201 n. 2.

Sheikh clearly meets the first two parts of the prima facie test. First, Sheikh is a member of a protected class under section 34–35–6(1)(a)(i) which provides that it is a discriminatory employment practice to retaliate against any person otherwise qualified be-

---

**5.** Although *University of Utah* was an age discrimination case, *McDonnell Douglas* a racial discrimination case, and *Bowen* a sex discrimination case, *McDonnell Douglas* recognized the need to modify the prima facie factors to fit the necessary factual situation. *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13.

*See also Bowen*, 639 F.Supp. at 1202 ("Some variation of the [prima facie] elements to 'fit' particular factual situations may avoid anomalous or unjust results which would do injustice to the concept of and purpose for establishing a prima facie case.").

cause of pregnancy, childbirth, or pregnancy-related conditions. Second, there were no disputes regarding Sheikh's qualifications for the job nor were there any complaints regarding her job performance. However, Sheikh's claim fails on the last prong of the prima facie test.

Although Sheikh was not terminated, an employee who believes that he or she has been constructively discharged may bring an action for discrimination because " 'an involuntary or coerced resignation is equivalent to a discharge.' " *Bulaich v. AT & T Info. Sys.*, 113 Wash.2d 254, 778 P.2d 1031, 1033 (1989) (citations omitted). To establish a claim of constructive discharge, the employee "must demonstrate that [his or her] employer['s] discriminatory conduct produced working conditions that a reasonable person would view as intolerable." *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1386 (10th Cir.1991). However, "[p]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast." *Garner v. WalMart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987). Thus, to establish constructive discharge under section 34–35–6, Sheikh must show that (1) her employer engaged in discriminatory conduct, and (2) that conduct created intolerable working conditions. The ALJ's determination that there was no constructive discharge is a question of fact, *Daemi*, 931 F.2d at 1384, which must be "supported by substantial evidence when viewed in light of the whole record before the court," Utah Code Ann. § 63–46b–16(4)(g) (1993);

*accord VanLeeuwen v. Industrial Comm'n*, 901 P.2d 281, 283 (Utah App.1995).

The ALJ found that "[t]here was no indication ... that the employer ever singled [Sheikh] out simply because she was pregnant or had been pregnant" and that "[t]here was no evidence that any adverse action was taken against her." We agree. The evidence shows that the schedule was not discriminatory and was clearly made on a three week rotating basis.[6] Moreover, the schedule change which created the undesirable schedule for Sheikh was necessary to avoid placing Russele, a new employee, on the graveyard shift. Sheikh knew that having a new employee on the graveyard shift was contrary to longstanding policy. Sheikh was also aware of the policy used to remedy this situation: moving the afternoon shift dispatcher to the graveyard shift. Therefore, Sheikh bore the burden of the difficult schedule only because she happened to be the dispatcher with the afternoon schedule.

Additional evidence also supports the finding that Sheikh did not establish a constructive discharge. The ALJ found that when Shook phoned to tell Sheikh about the schedule change, she offered Sheikh an alternate schedule which would have eliminated the double-backs, but Sheikh declined. The ALJ further found that Sheikh did not complain about the schedule until she gave Allred notice that she was resigning, and even then she only listed difficulty in obtaining a babysitter as the reason for her resignation.[7] Additionally, two days after Sheikh quit, the schedule rotated to the next assigned schedule which would have relieved Sheikh of the difficult schedule.[8] Accordingly, substantial

---

**6.** Although Sheikh claims she did not know that the schedule rotated every three weeks, sufficient evidence exists to the contrary. Sheikh admits she was aware of a letter which was circulated creating a three-week rotation beginning March 3, 1990. Furthermore, Sheikh testified that she projected the schedule she would be assigned upon returning from maternity leave would be based upon a three week rotation.

**7.** Sheikh did request either a job sharing position or a fixed schedule when she handed in her resignation. However, job sharing positions were not authorized in the dispatch center. Furthermore, Sheikh was well aware of the erratic nature of the dispatch position, which is evi-

denced by her signature on the Radio Dispatcher Supplemental Information sheet.

**8.** Sheikh claims that the Department had an obligation to assure her that the difficult schedule was only temporary. However, Sheikh was well aware of the rotating schedule, therefore, this contention is without merit. Furthermore, because Sheikh knew that she would rotate out of the schedule at issue, she had the obligation "not to assume the worst, and not to jump to conclusions too fast." *Garner v. WalMart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987). Thus, by resigning only a few days after she returned from her maternity leave and before she rotated out of the schedule, Sheikh breached her obligation to act reasonably.

evidence supports the ALJ's finding that Sheikh was not discriminated against and, therefore, was not constructively discharged.[9] *See Daemi,* 931 F.2d at 1386 (holding constructive discharge claim failed because employer did not engage in discriminatory conduct). Thus, because Sheikh failed to establish she was constructively discharged, the ALJ was correct in concluding that Sheikh did not establish a prima facie case of employment discrimination.[10]

## CONCLUSION

Sheikh was assigned the difficult schedule merely because of staffing difficulties and not because of discriminatory conduct on behalf of the Department. Consequently, Sheikh is unable to show she was constructively discharged and we affirm the Commission's conclusion that Sheikh was unable to establish a prima facie case of employment discrimination.[11]

BILLINGS and WILKINS, JJ., concur.

---

9. Not only is there abundant evidence in the record to support the Commission's determination, but Sheikh has also failed to properly marshal the same. *See Commercial Union Assoc. v. Clayton,* 863 P.2d 29, 36 (Utah App.1993). Sheikh simply·undertakes the exercise of repeating the evidence in support of her position, thereby rearguing her case.

10. Sheikh also claims the ALJ failed to consider her rebuttal evidence to the dispatch office's articulated legitimate, nondiscriminatory reason

for its conduct and, therefore, misapplied the law. However, because Sheikh failed to meet the prima facie test, the ALJ need not go further with its analysis and consider Sheikh's rebuttal evidence.

11. Sheikh impliedly raises several other issues which have been considered and rejected because they are without merit. *See State v. Allen,* 839 P.2d 291, 303 (Utah 1992); *State v. Carter,* 776 P.2d 886, 888–89 (Utah 1989).